## North American Restaurant and Oyster House v. John McElligott, Administrator.

### Gen. No. 12,578.

1. VERDICT—*when not disturbed.* A verdict will not be set aside as against the evidence, unless it is manifestly contrary to its apparent weight.

2. OWNERSHIP—*when sufficiently established.* The ownership of a business enterprise, for the purpose of establishing a *prima facie* case in an action for personal injuries, is made by the introduction of evidence as to the signs employed, the tax schedules made, and other circumstances tending to show the exercise of control and ownership.

3. MISNOMER—*when question of, cannot be raised.* The question of misnomer cannot be raised after joining issue and proceeding to trial upon the merits.

4. MACHINERY—*duty of owner of, wth respect to.* The owner of machinery is required with respect both to employes and others rightfully upon the premises where the machinery is located, to keep the same in a reasonably safe condition of repair.

5. ORDINARY CARE—*what constitutes, in times of extreme peril.* A person in extreme peril is not required in law to act with the same deliberate caution as in cases of less danger.

6. ARGUMENTS OF COUNSEL—*latitude allowed in.* In arguing causes counsel are allowed to make reasonable comments upon the evidence, and unreasonable restrictions will not be imposed.

7. JURY TRIAL—*number of peremptory challenges allowed in civil action.* Each side in a civil action is entitled to but three peremptory challenges, and the fact that there is more than one defendant does not give the defendants' side any more than a total of three challenges.

Action on the case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in this court at the March term, 1906. Affirmed. Opinion filed November 15, 1906.

**Statement by the Court.** This is an action on the case upon a death claim brought originally against appellant and the Illinois Maintenance Company by appellee for negligence causing the death of Richard D. McElligott. On a trial before the court and jury the Maintenance Company were found not guilty, appellant guilty with damages assessed at $5,000. Motions for a new trial and in arrest of judgment having been overruled, a judgment upon the verdict followed, and it is sought by this appeal to reverse the judgment, and numerous errors are assigned as demanding such action by this court.

The points urged in argument of appellant are principally: The action is brought against the wrong restaurant company; that deceased was guilty of contributory negligence; errors committed by the trial court in rulings upon the evidence and in refusing, modifying and giving certain instructions, improper and prejudicial remarks of appellee's counsel to the jury, the refusal of three peremptory challenges of jurors to this appellant, and damages are excessive.

The cause proceeded to trial upon issue joined on the fourth and eighth counts of the declaration. The fourth count charged ownership and possession of the engine gear and appliances to be in appellant in the restaurant which it was then conducting at the northwest corner of State and Monroe streets, Chicago; that the machinery was operated by the other defendant, the Illinois Maintenance Company; that deceased

was a stationary engineer in the employ of the Maintenance Company, and at its request was on the premises of appellant in managing, running and operating said engine and its appliances; that the engine was old, broken, defective, delapidated, unfit and unsafe, never having a capacity of more than two horse power, and that it was equipped with an old, broken, delapidated, defective, improper, unfit and unsafe governor, and was during all the time specified totally inadequate, unfit, unsafe and improper for use in the service in which it was operated; that on April 19, and 26, 1903, deceased notified defendants of the defects, which they promised to remedy at once by installing a new four horse power engine and appliances; that he relied on these promises, continued in the performance of his duties until April 26, 1903, the day of the accident and his death; that before a reasonable time had elapsed after such notifications of defects and promises to repair, and on April 26, 1903, one of the shafts and two of the pulleys and other parts of the machinery and appliances, without any fault on the part of deceased, and while he was in the exercise of due care and caution for his own safety, were thrown and fell with violence against the head of deceased, killing him.

The eighth count avers that the defendants carelessly, negligently and improperly overloaded and overtaxed the engine and suffered and permitted it to be so overloaded and overtaxed, and sundry of its appliances named to be and remain insecurely and improperly fastened and adjusted in a bad, unsafe and insecure manner and state of repair, so as to be unfit and unsafe for the uses to which they were put, alleging notification to the defendants of defects, promises to repair, resulting accident and death of appellee's intestate, substantially as in the fourth count.

The proof establishes that the deceased was a stationary engineer employed in and about certain machinery in a restaurant conducted in the basement of the building at the northwest corner of Monroe and

State streets. In this basement there were four engines; one in the boiler room, one in the engine room and two in the kitchen. The one in the boiler room was used for running a fan, and the one in the engine room used for refrigerating. In the kitchen one was used for running a fan and the other a dish-washing machine.

The little two horse power dish-washing machine engine which broke was situate in the northeast corner of the kitchen, on the ceiling of which were the shafts, hangers and pulleys. On the north side of the engine was a belt running from the driving wheel up to the pulley into the counter shaft overhead. On the lower part of the engine to which the belt was attached there was a main or crank shaft. To the north of the engine was a belt which was fastened with rivets, making an endless belt. On the other pulley of the shaft was a counter belt which ran down close to the floor and onto a pulley which was on the dish-washing machine, and on this machine was a loose pulley where the belt could be shifted from the tight to the loose pulley for controlling the use of the washing machine to keep it either working or idle, as desired. When this washing machine was in motion it started the pump revolving and threw streams of water on the dishes. The defect in the machine was in the governor not being sufficient to regulate the working of the machine, causing it to run at a high rate of speed and the belt to become detached from the pulley. There is some evidence to the effect that to operate the washing machine properly required an engine of four horse power—double the power of the engine used. The governor should have been automatic to prevent "racing;" it was not automatic, resulting in the machine "racing" very often. There was a throttle valve on one of the steam pipes, which by manipulation regulated the flow of steam. There was also a steam valve which when turned off shut down both the engine and washing machine. There was also another valve which could be reached by a

man "standing upon a chair," which operated to shut off or stop the running of the engine.

Deceased complained to O'Brien, the chief engineer, a few days before he met his death, about the dangerous condition of the engine, told him it was unsafe, and emphasized his complaint by saying that the "damned thing" would kill somebody, himself or one of the girls, if it was not fixed. O'Brien reported this complaint to Lang the next day, and Lang told him to go to Lafferty, the house engineer, and tell him there had to be a good governor, an automatic governor, the only governor that was safe and the only one they would have, and to punch him up about it and make him get it. O'Brien saw Lafferty the next day and communicated Lang's orders. Lafferty made an examination of the governor on the engine and made some changes, but it would not work; then Lafferty promised to put in an automatic governor, and a few days after the deceased threatened to quit, and was informed of Lafferty's promise to put on an automatic governor, and in faith of the promise he continued to work until he was killed, no change in the meantime having been made in the engine or any automatic governor attached to it.

The facts relating to existent conditions and the deceased's attitude toward them and his protest and the promise to rectify the difficulty for nearly a week prior to the disaster, is fairly well stated in the abstract of O'Brien's testimony. (A. pp. 60, 61, 62.)

"Lafferty said to me that he would put a new automatic on there after he had taken this governor off and put it back on and it wouldn't work. He said he would have it on Monday of the next week. It was during the previous week that McElligott came to me—the week preceding his death—and stated he wanted to quit. He wouldn't work with that little engine, and I told him what Lafferty had said, that he would have it put in and to keep on till Monday morning, and if it wasn't on then we wouldn't run the machine any longer, and that was the last night we were to run it until it was

fixed, with the consent of Mr. Lang. That is what I told McElligott. Lang told us men to work there until Sunday night, a day or two before he quit the place, I think; I don't remember just the date. It was along in the middle of the week, I think, that I told McElligott to work until Sunday night and if they didn't fix it by Monday I would shut the place down. The Sunday that Richard McElligott got killed was the Sunday following this talk. I saw him on that Sunday at four o'clock. He was working that day from four to twelve at night. My hours were eight to four. I spent my entire day with the machine that day. I hired a man to stay in the other room and I stayed by the engine door. I hired an extra man that day because they had an unusually large dinner; a great many dishes, and they kept the washing machine constantly going slowly, and I said I had to stay and watch that machine, right by it, and I had a man to look after the boilers for me and watch them run the fires and stay in the room. The name of the man I hired was Lynch; I hired him about ten o'clock in the morning, and I watched the engine that day until four o'clock, when McElligott came. Lynch took care of the fires—steam—in the other room—boiler room. Lynch didn't go that day. I hired him to stay with McElligott. I told McElligott that when he shut down the engine about half past eleven that we wouldn't open it up—we would leave it down until they put a governor on, something that would make it safe for us to run. When McElligott came at four o'clock he didn't want to run it; he wanted to shut it down. I don't remember what he said any more than he said he wouldn't work it any longer that night. I wasn't there at the time he was killed. I got there at eight o'clock the next morning, when I found the counter shaft on the ceiling torn down and hangers broken in two, both of them. I found the steam and exhaust pipe broken off where it had struck it. I found the governor broken off, in fact, the engine went out of business. It has never been resurrected since.''

The defect in the working of the engine resulting from the lack of an automatic governor was a great and dangerous acceleration of speed, termed racing, which was uncontrollable without an automatic gover-

nor, and racing could only be arrested by stopping and adjusting the mechanism before again starting it.

A similar accident, O'Brien says, happened to the shafting and pulleys about the previous New-year.

The valve used by deceased in stopping the racing of the engine at the time of the accident was the valve always used and the one most quickly accessible.

That the "racing" was a menace to the safety of the employes around the engine and the running gear is evident from the accident early in January, 1903, and that the employes stood in dread of such an accident is plainly inferrable from the sudden exit of the girls at the time of the "racing" which resulted in the gearing coming down and killing deceased, or as O'Brien put it on cross-examination (R. p. 256): "I was afraid some part of it would come down or would fly and hit me. * * * I was afraid some part would fall and strike somebody, and that is what did happen when this man—deceased—got hurt." The accident occurred by one of the employes, without notice to deceased, stopping the dish-washing machine, which started the engine to racing, making a loud and terrifying noise, frightening the girl employes so that they ran away, when deceased immediately called to one of the girls to start the dish-washing machine, the effect of which would have been to have relieved the momentum and slacken the speed, but the girl fled through fear. Deceased immediately started for the engine, and while he was in the act of reaching for the valve on the engine to shut off the steam, the force of the racing caused the hangers, pulleys and shafts to break away from their fastenings, falling upon deceased and killing him.

Deceased was thirty-two years of age, and left a widow and four children surviving him, who were dependent upon him for support.

To the insistence that the restaurant was owned and operated by the North American Restaurant Company, there is interposed on the part of appellee proof which is uncontradicted, that Louis Eckstein, Louis M. Stum-

mer, Benjamin J. Rosenthal, Theodore and William Lillienfield and Aaron Nusbaum were jointly engaged in many business enterprises; that they had incorporated some of them under the corporation laws of this state; that among others was the American Restaurant Company and the North American Restaurant and Oyster House—appellant here; that the officers and stockholders in both these companies were identical; that the business of both was managed from the same office, and the respective accounts kept by the same staff of clerks; that the bills of fare at this restaurant were headed North American Restaurant & Oyster House; that among numerous signs on the exterior of the place were two, reading North American Restaurant & Oyster House. In the application for articles of incorporation it was stated the object of the proposed corporation was to own, keep and maintain restaurants, eating places, dram-shops, etc., and that its intended place of business was "Northwest corner of Monroe and State streets, Chicago." The day before the accident a schedule for personal property tax, furnished the assessor pursuant to law, returns the North American Restaurant Company as liable for such tax. At the time of the accident the North American Restaurant Company was licensed by the city of Chicago to sell ardent liquor in that restaurant, and eleven of such licenses covering four monthly periods were received in evidence. Various leases, contracts and bills in relation to the operation of this restaurant were received in evidence running to or made by the American Restaurant Company, to offset the foregoing evidence of appellee. There is also evidence to the effect that employes in the restaurant were paid by the restaurant cashier.

O. W. DYNES, for appellant.

KICKHAM SCANLAN, for appellee.

MR. JUSTICE HOLDOM delivered the opinion of the court.

It is patent from the foregoing statement that there was much conflict in the evidence on the crucial questions of fact tending to fix the legal liability of appellant for the death of Richard D. McElligott. Not only was the question of ownership or operation of the restaurant by appellant involved, and whether or not the deceased was an employe of appellant, but whether or not it was a fact that deceased not being such employe was nevertheless employed in and about the machinery upon the premises of appellant owned by another corporation, so as to make appellant liable for injuries sustained for its failure to keep such machinery in a safe condition of repair and not imperil the life or limb of the deceased—a duty cast upon it by law if deceased and appellant bore such relationship to each other. Also the questions of fact as to whether any negligence could be attributed to the deceased as the primary or impelling cause of the accident, and whether deceased gave notice of the existing defects, which appellant promised him it would remedy.

It is peculiarly the province of the jury to harmonize such conflicting testimony and to say by its verdict where the truth is. It is the duty of the court, under proper instructions as to the legal principles to be applied to the evidence, to leave to the jury the solution of the conflicts in the evidence. It is for them to reconcile the conflicts. When this has been done under evidence properly admissible, and the instructions of the court do not violate legal principles applicable to the case made by the evidence under the pleadings, and this court cannot say that the verdict is manifestly contrary to the apparent weight of the evidence, we will not, on what might appear to our minds as doubtful questions of fact, disturb the findings of the jury. The weight of the evidence and the credit to be given to the several witnesses are questions for the jury to decide. Illinois Central R. R. v. Smith, 111 Ill.

App. 177; Chicago & Alton R. R. v. Fisher, 141 Ill. 614.

The question of the ownership of the restaurant, while warmly contested, is in reality not fraught with much difficulty. In the face of the avowed objects and purposes stated to the state officer on application to incorporate appellant, the signs around the restaurant, the liquor licenses, the tax schedules, the heading of the bills of fare, the men engaged in the active direction and management of the place, all form a strong chain of evidence stamping appellant as proprietor, which the evidence of leases, contracts and bills made by the dominant forces in the enterprise are futile to overcome when weighed by the jury and common sense principles applied to their solution. The sign, North American Restaurant, can only be viewed as a convenient adaptation of appellant's name in abbreviated form, to designate the restaurant and distinguish it from others in its locality operated by appellant; nor can it be regarded in the light of the proof as conveying any intimation of ownership. Again, appellant virtually admits it is the right company sued by the wrong name. This fact, if it be one, should have been set up by plea in abatement. If it had so been, it is quite clear that it would have availed nothing to a replication that appellant was known as well by one name as the other. However, if the point was otherwise well taken, it is waived by joining issue and proceeding to trial upon the merits. Springfield R. R. v. Hoeffner, 175 Ill. 634.

Whether deceased was an employe of appellant or not, it owed him the duty, while he was in charge of their machinery, to keep such machinery in a reasonable condition of repair, so that it could be operated without danger of injury to him. Con. I. M. Co. v. Keifer, 134 Ill. 481.

The proof is satisfactory as to deceased being in the exercise of due care for his own safety at the time he received his mortal injuries. He seems to have been

alert and alive to his perilous condition, for he at once'
reached for the valve on the engine to shut off the
steam and stop the further "racing" of the engine
and avert the consequences threatened by its con-
tinued "racing." He hallooed to a girl to start the
dish-washing machine, the starting of which would have
the effect of modifying the rapid motion of the engine.
Had this been done, the accident, for the time being,
might have been averted, but the girl became fright-
ened with the rest of her companions, and fled from the
danger zone. In so doing they obeyed instinctively that
law of nature which impels to self-preservation, and
they escaped injury. While there were other means of
stopping the engine at hand, without encountering the
dangers confronted at the valve he reached for, yet
that was the valve invariably used for that purpose,
and with the sudden condition forced upon him, and
the evident necessity for immediate action, he had no
time for accurate calculation or thought, but force of
habit undoubtedly impelled him in this moment of peril
to reach for the valve he had always used. In so doing
he was not guilty of any negligence contributing to his
death. The knowledge which deceased possessed of the
unsafe condition of the engine, and his continuing to
work at it after having such knowledge, is not neg-
ligence *per se* in view of the fact, not seriously dis-
puted, that he had given notice of such defects to ap-
pellant, who had promised to remedy them, subse-
quently promising to install a new engine.

Appellant was guilty of negligence causing the death
of appellee's intestate in permitting the engine in its
known dangerous condition to be operated. The evi-
dence demonstrates beyond cavil that its condition was
one menacing the safety of those engaged in and about
it. A similar accident had happened in January pre-
ceding the accident in April. Though fortunately this
was not attended with injuries to any employe, it was
the strongest kind of warning to appellant to remedy
the defects. The warning was not heeded. An at-

tempt to repair within two weeks of the accident 'was shown to be abortive in remedying the defects. Complaints of the deceased about the impending dangers were met with promises to correct the weakness in the engine, and finally to install a new one. These promises, credited by deceased, lured him to his death. These facts clearly establish negligence in appellant and make it liable to respond in damages in this action.

We have examined with much care all that has been urged as claimed errors committed by the court in its instructions to the jury. An examination of these instructions discloses that the jury were fully and fairly instructed as to the law environing the facts, and necessary to aid the jury in solving correctly the conflicting evidence. Complaint is made of an instruction given at the instance of the trial judge, without the request of either of the parties. A careful scrutiny of it fails to disclose any legal vice. It was in a measure favorable to the defense. There may be a few technical inaccuracies in some of the instructions, but there are no just or substantial grounds in any of them for reversing the judgment.

A painstaking examination of the evidence fails to disclose any harmful rulings of the court either in the admission or exclusion of evidence.

We find nothing in the remarks of counsel for appellee to the jury objected to, which in any manner infringes or violates the ethics of the occasion, or which were unwarranted or constituted an unfair statement in any particular of the inferences justly deducible from the evidence. The rule promulgated in I. C. R. R. v. Beebe, 174 Ill. 13, is that ''in arguing cases to the jury attorneys must be allowed to make reasonable comments upon the evidence. The interests of public justice require that counsel should not be subjected to any unreasonable restriction in this regard.'' Counsel's argument did not proceed outside of the latitude thus allowed.

It is said that it was error in the trial court to refuse to allow counsel for appellant in his examination of the jury three peremptory challenges. At the time of empanelling the jury there were two defendants and three peremptory challenges were allowed the defense. This precise question has been settled in Schmidt v. C. & N. W. Ry., 83 Ill. 405. and Gordon v. City of Chicago, 201 Ill. 623. The statute on this subject was construed by the court where it said, in Schmidt v. C. & N. W. Ry., *supra,* that "this provision has been in force since 1827, if not longer, and as we understand, during all that time it has been the general practice, and so understood by the entire profession, that each side to the case, without reference to the number of persons in each, in all civil cases, has but three peremptory challenges, and this is true whether there be one or a number of persons plaintiff or defendant." This is still the law.

There is nothing in the claim that the damages are excessive. It was for the jury to assess the amount. They did so within the limitations of the statute.

Deceased left a widow and four young children. He was their support. He was an industrious workman, who had but entered the last decade of middle life. There is nothing in the record to show that he was not in good health, and had a reasonable expectancy of life. The whole matter of the amount of damages to be awarded was for the jury. For citation of authority on this point we refer to Chicago City Ry. Co. v. Strong, administrator, *post,* p. 511. These decisions control and inhibit our interfering with the award of damages made by the jury.

We are of opinion that the trial was fair, and that appellant's rights were amply protected, and that none of the errors on this record are well assigned, and the judgment of the Superior Court is affirmed.

*Affirmed.*